Sheehan & Associates, P.C.
Spencer Sheehan
60 Cutter Mill Rd Ste 409
Great Neck, NY 11021-3104
Tel: (516) 268-7080
spencer@spencersheehan.com

United States District Court
Southern District of New York

1:20-cv-04936-RA

William Marsella, Robert Paterson, individually and on behalf of all others similarly situated,

                Plaintiffs,

- against -

The Hain Celestial Group, Inc.,

                Defendant

First Amended
Class Action Complaint

Plaintiffs allege upon information and belief, except for allegations pertaining to plaintiffs, which are based on personal knowledge:

1.     The Hain Celestial Group, Inc. ("defendant") manufactures, distributes, markets, labels and sells organic vanilla soymilk with added nutrients under the Westsoy brand labeled as Organic Plus Vanilla Soymilk ("Product").

2.     The relevant front label representations include "Westsoy," "Organic Plus," "Vanilla" and "Soymilk."



3. The representations are misleading because the front label and ingredient list fail to disclose artificial flavors.

4. Surveys have consistently found that at least seven out of ten consumers avoid artificial flavors.[1]

5. Reasons for eschewing artificial flavors include a desire to avoid synthetic ingredients with detrimental health effects.[2]

---

[1] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018.
[2] Donna Berry, Playing the natural flavor game, Food Business News, Jan 1, 2018.

2

6. "All demographics [of consumers] from Generation Z to Baby Boomers – say they would pay more" for foods with no artificial flavors."[3]

7. Products made with natural instead of artificial flavors are "more popular than ever and approaching performance parity with their synthetic counterparts."[4]

8. Flavors are often the most valued part of a food, and foods with natural flavors are considered higher quality by consumers.

9. The FDA established regulations so that consumers are told whether the flavor of what they are eating or drinking contains (1) from the characterizing ingredient, (2) natural flavor from the characterizing ingredient, i.e., strawberry flavor from strawberries, (3) natural flavor from natural source other than the characterizing ingredient, i.e., strawberry flavor derived cherries and/or (4) artificial flavor.

10. Where a food gets its flavor from a characterizing ingredient – i.e., strawberries in strawberry shortcake, the food can be named "strawberry shortcake" because all its strawberry flavor comes from strawberries. 21 C.F.R. § 101.22(i)(1).

11. If a food characterized as strawberry contains some strawberries, but not enough to characterize the food and contains natural flavor derived from strawberries, it can be labeled as "natural strawberry flavored." 21 C.F.R. § 101.22(i)(1)(i).

12. Where some flavor is from the characterizing ingredient with other flavors from natural sources other than the characterizing flavor which enhance, resemble or simulate the characterizing flavor, the front label is required to state, "With Other Natural Flavor." 21 C.F.R. § 101.22(i)(1)(iii).

13. The popularity of vanilla in the 19th century led to the isolation of the most

---

[3] Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.
[4] Kimberly Decker, Advances in natural flavors, Food & Beverage Insider Oct 12, 2020.

predominant flavor component, vanillin.

14.     The availability of low-cost vanillin resulted in foods purporting to contain vanilla, which either contained no vanilla or a trace or de minimis amount, boosted by synthetic vanillin.

15.     However, vanillin separated from the rest of the vanilla bean does not constitute vanilla flavor.

16.     Indeed, sensory evaluation of pure synthetic vanillin, often used for synthetic imitation vanilla renditions, possesses a lack luster vanilla-like taste and odor with a "chemical-like" nuance, because it lacks the other molecules in vanilla.

17.     Though the Product's front label only references "Vanilla," the ingredient list does not clarify and disclose to consumers that its "vanilla" taste comes predominantly from non-vanilla sources which are made through artificial processes, since the flavoring is declared as "Vanilla Flavor With Other Natural Flavors."

> INGREDIENTS: ORGANIC SOYMILK (FILTERED WATER, WHOLE ORGANIC SOYBEANS), ORGANIC EVAPORATED CANE JUICE, TRICALCIUM PHOSPHATE, POTASSIUM CITRATE, VANILLA FLAVOR WITH OTHER NATURAL FLAVORS, SEA SALT, CARRAGEENAN, MAGNESIUM CHLORIDE, VITAMIN E (D-ALPHA TOCOPHERYL ACETATE), VITAMIN A PALMITATE, VITAMIN D2, VITAMIN B2 (RIBOFLAVIN), VITAMIN B12.

**INGREDIENTS:** ORGANIC SOYMILK (FILTERED WATER, WHOLE ORGANIC SOYBEANS), ORGANIC EVAPORATED CANE JUICE, TRICALCIUM PHOSPHATE, POTASSIUM CITRATE, VANILLA FLAVOR WITH OTHER NATURAL FLAVORS, SEA SALT, CARRAGEENAN, MAGNESIUM CHLORIDE, VITAMIN E (D-ALPHA TOCOPHERYL ACETATE), VITAMIN A PALMITATE, VITAMIN D2, VITAMIN B2 (RIBOFLAVIN), VITAMIN B12.

18. Based on laboratory testing, the "other natural flavors" include vanillin from non-vanilla sources.

19. "Natural flavor" is defined as:

> The term *natural flavor* or *natural flavoring* means the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional. Natural flavors include the natural essence or extractives obtained from plants listed in §§ 182.10, 182.20, 182.40, and 182.50 and part 184 of this chapter, and the substances listed in § 172.510 of this chapter.

21 C.F.R. § 101.22(a)(3).

20. This means that "natural flavor" must be made through a natural process, such as distillation, roasting, heating, enzymolysis or fermentation.

21. Artificial flavor is defined as any flavoring from a synthetic source or made through an artificial process. 21 C.F.R. § 101.22(a)(1).

22. Though the regulation for artificial flavor does not specify the processes which can be used, this is because artificial flavors can be made through any process not specified in the sub-section for "natural flavor."

23. In the context of non-vanilla source material, vanillin can be produced from natural or synthetic sources.

24. To properly be designated as a "natural flavor," the natural source for vanillin must be converted through a natural process.

25. If a natural source – lignin, for example – is converted to vanillin through an artificial or synthetic process, it is required to be labeled as an artificial flavor.

26. These regulations recognize that the use of chemical reactions – including extremely high heat – fundamentally transform the starting material such that it cannot be considered a

5

"natural flavor."

27. Laboratory testing confirmed that the "other natural flavors" include vanillin from non-vanilla sources.

28. Vanillin is available from the following main sources: natural vanilla extract from vanilla beans; lignin; petrochemicals; ferulic acid; and eugenol.

29. Vanillin (3-methoxy-4-hydroxybenzaldehyde) is a major component of natural vanilla.

30. Vanillin is found in the form of its β-D-glucoside (glucovanillin) in green vanilla beans.

31. The curing process, including the hydrolysis of its β-D-glucoside, leads to the release of vanillin from glucovanillin, at concentrations of 1-4% of dry weight of cured beans.

32. Cured vanilla beans are used mainly for the preparation of vanilla extract, vanilla concentrate, etc., and contain more than 600 phytochemicals including vanillin.

33. Vanillin was first isolated from vanilla by Gobley in 1858.

34. Years later (1874), Tiemann and Haarmann prepared vanillin by the oxidation of coniferyl alcohol abundant in pine tree lignin.

35. They went on to form a company that synthesized vanillin from guaiacol on a commercial level (a process discovered by Karl Reimer in 1876), which is today part of Symrise.

36. All commercially-viable methods of producing vanillin from non-vanilla sources involve chemical reactions, which include high heat with the aid of sodium chloride, and high pressure.

37. Though fermentation methods exist to create a "naturally produced vanillin," these methods are not sufficiently viable on a large scale and have not been replicated, despite reports

of this method.

### A. Vanillin from eugenol

38. Eugenol is an aromatic liquid and the major constituent of clove oil.

39. There is an enzymatic – natural – reaction for converting eugenol to vanillin.

40. However, because of the toxicity and limited water solubility of eugenol, the rate of conversion is very low, so this 'natural' process is not used commercially.

41. The main methods used today for industrial production of vanillin from eugenol was discovered by Tiemann and Haarmann.

42. The first method involves converting eugenol to vanillin through high heat and high pressure.

43. While heating is the type of process which allows for a flavor to be considered a "natural flavor," the level of heat applied is specially designed for processing 800 degree Celsius – sodium hydroxide (a chemical) is used to change bond from eugenol to iso-eugenol which converts to vanillin

44. To elevate something to 800 degrees Celsius requires the application of high amounts of pressure – 20 atmospheric pressure units.

45. Therefore, this process is outside of what is considered a natural process for the purpose of creating a natural favor.

46. The second method involves the isomerization of eugenol to iso-eugenol under alkaline conditions, with subsequent conversion to coniferyl alcohol.

47. The latter is oxidized to ferulic acid, which breaks down to vanillin under high pressure conditions, a process similar to that used in breaking lignin to vanillin.

48. However, the process of isomerization of eugenol to iso-eugenol, followed by

7

oxidation to coniferyl alcohol, then to ferulic acid, and finally to vanillin, involves numerous chemical reactions, instead of the processes described in the requirements for producing a "natural flavor."

49. For vanillin from eugenol, the precursor may be natural, but the processes - isomerization of eugenol to iso-eugenol under alkaline conditions and high heat with high pressure – are not natural processes as that term is understood and defined under 21 C.F.R. § 101.22(a)(3).

B. Vanillin from ferulic acid

50. Ferulic acid is a source of non-vanilla vanillin.

51. An inherent problem in all biological systems, except for vanilla beans, is the inability to accumulate vanillin or other related carbonyl compounds.

52. These compounds are converted to their respective alcohols or acids.

53. The raw material is natural and the process *can* be natural.

54. However, the natural process is expensive – the market price of vanillin from ferulic acid is over $500/kg – which renders this option non-viable for most commercial usage.

C. Vanillin from lignin

55. Vanillin is also derived from lignin.

56. Lignin is the second most abundant polymer in nature,

57. There are several types of lignin based on their monomeric compositions.

58. Most lignin are rich in guaiacyl (G) and syringyl (S) residues.

59. Lignin from Gymnosperms (softwoods) such as pine or spruce are typically composed predominantly of G units, with a minor proportion of p-hydroxyphenyl units (H-lignin).

60. Lignin from spruce and pine wood is particularly suitable for this production, because the wood is rich in coniferyl alcohol and ferulic acid, which serve as foundational

compounds for vanillin production.

61. Vanillin from lignin has the isotopic ratio of a natural product, although vanillin from lignin is considered synthetic because chemical reactions are used for vanillin formation.

62. Lignin is difficult to degrade by biological means, which is why production of vanillin from lignin entails chemical processes.

63. Vanillin from lignin is sold as synthetic vanillin and required to be labeled as an artificial flavor because it is not made through a natural process. 21 C.F.R. § 101.22(a)(3).

D. Vanillin from guaiacol

64. Vanillin is also produced from guaiacol and glyoxylic acid.

65. It is estimated that guaiacol is the method that produces 85% of vanillin.

66. There are two methods for converting guaiacol into vanillin – nitrosation and the glyoxylic acid.

67. Currently, the glyoxylic acid process is the only one used commercially.

68. It begins with the condensation of guaiacol with glyoxylic acid, followed by an oxidation step and the simultaneous acidification and decarboxylation step, yielding vanillin.

69. The acidification and decarboxylation processes are not any form of the natural processes permitted for creating natural flavors – distillation, roasting, heating, enzymolysis or fermentation.

70. The product contains a de minimis amount of vanilla but is primarily flavored from vanillin.

71. This added vanillin is required to be declared as an artificial flavor because it does not qualify as a "natural flavor" since even if the starting material is natural, it undergoes processes other than those specified in the regulations for natural flavor.

72. The added vanillin is an artificial flavor that simulates the characterizing flavor, which means the front label is required to disclose this fact through the statement, "Artificially Flavored." 21 C.F.R. § 101.22(i)(2).

73.

74. The Product's flavoring lacks the complexity and flavor notes associated with a "vanilla" flavored food, because instead of using pure vanilla extract, it contains added vanillin.

75. Consumers are unable to know that the "Vanilla WONF" contains flavors simulating vanilla that are subject to artificial processes, which produces a flavor which purports to resemble vanilla – vanillin.

76. The representations are misleading because the front label omits any reference to artificial flavor, in violation of the requirement it disclose this fact.

77. Because Defendant's ingredient list designates "Vanilla Flavor with Other Natural Flavors," it is inconceivable for consumers to ascertain the Product contains artificial flavors – flavors from natural or artificial source material but made through artificial processes including chemical reactions and high heat involving sodium chloride.

78. Defendant knows consumers will pay more for the Product because the front label only states "vanilla" and not "artificially flavored" and "does not taste like real vanilla."

79. In addition, including vanillin as part of the "other natural flavors" in the organic vanilla soymilk Product is misleading because, when read with the unqualified front label of "vanilla," it implies that the Product contains only natural flavors and natural vanilla flavors, even though the added vanillin is not derived from vanilla beans and is converted to vanillin through artificial processes.

80. Defendant's marketing is designed to – and does – deceive, mislead, and defraud

Plaintiff and consumers.

81. Defendant misrepresented the Product through affirmative statements and omissions.

82. Defendant sold more of the Product and at higher prices than it would have in absence of this misconduct, resulting in additional profits at the expense of consumers.

83. The value of the Product that plaintiffs purchased, used and/or consumed was materially less than its value as represented by defendant.

84. Had plaintiffs and the proposed class members known the truth, they would not have bought the Product or would have paid less for it.

85. As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $2.99 and $4.99 for cartons of 32 OZ and 64 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

## Jurisdiction and Venue

86. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

87. Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

88. Plaintiff William Marsella is a citizen of Florida.

89. Defendant The Hain Celestial Group, Inc. is a Delaware corporation with a principal place of business in New Hyde Park, Nassau County, New York and therefore is a citizen of New York.

90. Diversity exists because Plaintiff William Marsella and defendant are citizens of different states.

91. Upon information and belief, sales of the Product and statutory and other monetary damages, exceed $5 million during the applicable statutes of limitations, exclusive of interest and costs.

92. Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claim occurred, *viz*, the purchase of the Product and the misleading representations relied upon by plaintiff Paterson.

93. This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

## Parties

94. Plaintiff William Marsella is a citizen of Punta Gorda, Charlotte County, Florida.

95. Plaintiff Robert Paterson is a citizen of New York, New York County, New York.

96. Defendant The Hain Celestial Group, Inc. is a Delaware corporation with a principal place of business in New Hyde Park, New York, Nassau County.

97. Defendant sells numerous organic packaged foods to consumers and is considered a leader in the natural foods industry.

98. During the relevant statutes of limitations, plaintiffs purchased the Product within their district and/or State for personal consumption and/or use in reliance on the representations the Product's flavor contained only vanilla flavoring from vanilla beans and was not enhanced by non-vanilla flavors including artificial flavors.

99. Plaintiff William Marsella bought the Product on multiple occasions, including in April 2020 at Publix, Burnt Store Marketplace, 3941 Tamiami Trl Unit 3145 Punta Gorda, FL 33950.

100. Plaintiff Robert Paterson bought the Product on multiple occasions, including in September 2019 at Whole Foods in the Time Warner Center in Manhattan.

101. Plaintiffs bought the Product because they expected it would contain vanilla from vanilla beans and would not contain artificial flavors, because the front label failed to disclose the presence of artificial flavors, and they expected to see such a statement based on their prior experiences purchasing foods and beverages.

102. Plaintiffs were deceived by and relied upon the Product's deceptive labeling.

103. Plaintiffs would not have purchased the Product in the absence of Defendant's misrepresentations and omissions.

104. The Product was worth less than what Plaintiffs paid for it and they would not have paid as much absent Defendant's false and misleading statements and omissions.

105. Plaintiffs intend to, seeks to, and will purchase the Product again when they can do so with the assurance that Product's labels are consistent with the Product's components.

## Class Allegations

106. The classes will consist of all purchasers of the Product who reside in New York and Florida during the applicable statutes of limitations.

107. Plaintiffs seek class-wide injunctive relief based on Rule 23(b) in addition to a monetary relief class.

108. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

109. Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

110. Plaintiffs are adequate representatives because their interests do not conflict with other members.

111. No individual inquiry is necessary since the focus is only on defendant's practices

and the class is definable and ascertainable.

112. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

113. Plaintiffs' counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

114. Plaintiffs seek class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350, Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201 et seq, Florida Statutes
(Consumer Protection Statutes)

115. Plaintiffs incorporate by reference all preceding paragraphs.

116. Plaintiffs and class members desired to purchase and consume products which were as described and marketed by defendant and expected by reasonable consumers, given the product type.

117. Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

118. Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Product.

119. The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product.

120. Consumers do not expect the Product to be flavored by sources other than vanilla beans and contain artificial flavors, which includes flavorings made through artificial processes.

121. Plaintiffs relied on the statements, omissions and representations of defendant, and defendant knew or should have known the falsity of same.

122. Plaintiffs and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

123. Plaintiffs incorporate by reference all preceding paragraphs.

124. Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Product.

125. The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect artificial flavors where a product is labeled "vanilla" without more.

126. The ingredient list declaration of "other natural flavors" fails to tell consumers and plaintiff that a trace amount of vanilla is present and what they taste as vanilla is from artificial flavor.

127. Defendant had a duty to disclose and/or provide non-deceptive marketing of the Product and knew or should have known same were false or misleading.

128. This duty is based on defendant's position, holding itself out as having special knowledge and experience in the sale of the product type.

129. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a well-known and respected brand or entity in this sector.

130. Plaintiffs and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Product.

131. Plaintiffs and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

132. Plaintiffs incorporate by reference all preceding paragraphs.

133. The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect artificial flavor – vanillin from non-vanilla sources – where a product is labeled "vanilla" without more.

134. Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front label and ingredient list, when it knew its statements were neither true nor accurate and misled consumers.

135. Plaintiffs and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Unjust Enrichment

136. Plaintiffs incorporate by reference all preceding paragraphs.

137. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiffs and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiffs demand a jury trial on all issues.

   **WHEREFORE**, Plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying plaintiffs as representatives and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and

representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   January 22, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
60 Cutter Mill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

1:20-cv-04936-RA
United States District Court
Southern District of New York

William Marsella, Robert Paterson, individually and on behalf of all others similarly situated,

                              Plaintiffs,

   - against -

The Hain Celestial Group, Inc.,

                              Defendant

## First Amended Class Action Complaint

```
Sheehan & Associates, P.C.
60 Cutter Mill Rd Ste 409
 Great Neck NY 11021-3104
    Tel: (516) 268-7080
    Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: January 22, 2021

                                                              /s/ Spencer Sheehan
                                                              Spencer Sheehan